UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Paul Revere Life Insurance Company,<br>　　　*Plaintiff*, | Civil No. 3:08cv1795 (JBA) |
| *v.* | |
| Michael C. DiBari,<br>　　　*Defendant*. | November 19, 2010 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Paul Revere Life Insurance Company ("Paul Revere") filed a Complaint on November 25, 2008, seeking declaratory judgment pursuant to 28 U.S.C. § 2201, that it owed no duty to pay disability benefits under two disability insurance policies issued to Defendant Michael C. DiBari and that it is entitled to repayment of benefits paid in connection with those policies. Paul Revere now moves for summary judgment [Doc. # 80] in its favor on its Complaint for declaratory relief and on Dr. DiBari's remaining counterclaim. Dr. DiBari moves for summary judgment [Doc. # 77] in his favor on Paul Revere's Complaint for declaratory relief. For the reasons stated below, Paul Revere's motion for summary judgment will be granted, and Dr. DiBari's motion for summary judgment will be denied.

I.　　　Factual Background

　　　A.　　　Paul Revere Policies

Dr. Michael DiBari, a general and cosmetic dentist, applied for disability income insurance with Paul Revere in August 1990. (DiBari Aff., Ex. 1 to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 79] ¶ 3.) On December 28, 1990, Paul Revere issued two insurance policies to Dr. Dibari: Policy No. 0102471374 for occupational disability income insurance ("Disability Income Policy") (Disability Income Policy, Ex. 2 to Pl.'s Loc. R. 56(a)1 Stmt.), and Policy No.

0102471375 for business overhead expense coverage insurance ("BOE Policy") (BOE Policy, Ex. 3 to Pl.'s Loc. R. 56(a)1 Stmt.). In the event of "Total Disability" the Disability Income Policy provides that Paul Revere will "periodically pay a Total Disability benefit during Your Total Disability." (Disability Income Policy at Part 2.1.) The Disability Income Policy defines Total Disability as: "because of Injury or Sickness: a. You are unable to perform the important duties of Your Occupation; and b. You are under the regular and personal care of a Physician." (*Id.* at Part 1.9.) The Disability Income Policy also provides for a "Residual Disability benefit," and includes the following definition:

> "Residual Disability", prior to the Commencement Date, means that due to Injury or Sickness:
>> a. (1) You are unable to perform one or more of the important duties of Your Occupation; or
>> (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
>> b. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and
>> c. You are under the regular and personal care of a Physician.
> As of the Commencement Date, Residual Disability means that due to the continuation of that Injury or Sickness:
>> a. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and
>> b. You are under the regular and personal care of a Physician
> Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any.

(*Id.* at Part 1.10.)

These definitions are subject to an amendment attached to the Policy, however, which deletes "You are under the regular and personal care of a Physician" wherever it appears in the Policy and replaces it with: "You are receiving Physician's Care. We will

2

waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You." (*Id.* at Amendment A683.) The amendment defines "Physician's Care" as "the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability." (*Id.*)

The BOE Policy provides similar coverage for both Total and Partial Disability. (BOE Policy at Parts 2.1, 2.6.) Its definition of Total Disability is identical to the Disability Income Policy's definition: "because of Injury or Sickness: a. You are unable to perform the important duties of Your Occupation; and b. You are under the regular and personal care of a Physician." (*Id.* at Part 1.9.) The BOE Policy defines Partial Disability as follows:

> "Partial Disability" means that because of Injury or Sickness:
>> a. You are:
>>> (1) Unable to perform one or more of the important duties of Your Occupation; or
>>> (2) Unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
>> b. You are under the regular and personal care of a Physician.
>
> Partial Disability must follow right after a period of Total Disability for which benefits were payable.

(*Id.* at Part 1.10). The BOE Policy contains an identical amendment regarding "Physician's Care" as the Disability Income Policy:

> The following definition is added to the Policy:
>> "'Physician's Care' means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability."
>
> In addition, delete the following language wherever it appears:
>> "You are under the regular and personal care of a Physician."
>
> Substitute the following language:

> "You are receiving Physician's Care. We will waive this requirement
> if We receive written proof acceptable to Us that further Physician's
> Care would be of no benefit to You."

(*Id.* at Amendment A683.)

### B. DiBari's Disability Claim

On March 12, 2008, Dr. Dibari notified Paul Revere, through his insurance agent, that he intended to file a claim for disability benefits under the Disability Income and BOE Policies. (Dibari Aff. ¶ 10.) On April 29, 2008, Dr. Dibari submitted to Paul Revere a Claim Form claiming total disability as of April 24, 2008 under both the Disability Income and BOE Policies as the result of "Bilateral Carpal Tunnel Syndrome." (Claim Form, Ex. 11 to Pl.'s 56(a)1 Stmt., at 1.) Dr. Alfonso Campo, a specialist in Internal Medicine, submitted an Attending Physician's Statement along with the Claim Form, diagnosing DiBari's condition as "Carpal Tunnel Syndrome (Bilateral)" and describing DiBari's symptoms as "constant, worsening pain, numbness, tingling, coldness both hand [sic] exacerbated when working, driving." (*Id.* at 2.) The Attending Physician's Statement also described DiBari's current treatment program: "Vitamin B6; massage; epsom salt soaks; NSAiDs; Tylenol; rest for weeks at a time; wrist splints." (*Id.*) Dr. Campo indicated in the Statement that he did not expect improvement in DiBari's capabilities and that the disability was permanent: "[DiBari] cannot continue to work as a dentist as the continuous use of instruments will aggravate his condition." (*Id.* at 3.)

### C. Bilateral Carpal Tunnel Syndrome Diagnosis and Conservative Treatment

Dr. Campo first treated DiBari for carpal tunnel syndrome on May 12, 2005, and stated on the Claim Form that DiBari received an electromyography ("EMG") test in 2005 that indicated bilateral carpal tunnel syndrome and again in March 2008, which "showed

significant progression." (*Id.* at 2.) Dr. Evangelos Xistris, a neurologist listed as an additional treating physician on DiBari's Claim Form (*id. at 3*), performed an EMG on DiBari on February 7, 2006 and concluded that DiBari suffered from "mild bilateral carpal tunnel syndromes . . . worse on the left [hand] than they were on the right" (Xistris Dep., Ex. 2 to Def.'s 56(a)1 Stmt., at 66:1–67:14). Dr. Xistris performed a second EMG on March 14, 2008 and concluded that the bilateral carpal tunnel syndrome findings were "worse on this exam than they were on the other exam." (*Id.* at 95:5–98:2.) Dr. Campo's initial prescribed treatment regimen for DiBari's carpal tunnel syndrome in 2005 consisted of Epsom salt soaks, which he later expanded to include massages and over–the–counter pain medication. (DiBari Dep., Ex.8 to Pl.'s 56(a)1 Stmt. at 34:10–19, 41:3–43:5; Claim Form at 2.) Dr. Xistris also prescribed Vitamin B6 and Coenzyme Q10, an antioxidant, in 2006. (DiBari Dep. at 45:12–18.) None of these recommended treatments helped to alleviate DiBari's symptoms. (*Id.* at 41:10–12.) DiBari also wore splints on his hands and wrists for a period of time, but the splinting did not alleviate his symptoms either. (*Id.* at 94:11–96:12.)

      D.      Carpal Tunnel Release Surgery and Ongoing Treatment

During his March 2008 consultation with DiBari, because "conservative treatment" and "medical management" had not alleviated DiBari's symptoms, Dr. Xistris discussed Carpal Tunnel Release Surgery ("Release Surgery"), a procedure in which "the transverse carpal ligament is cut, and the pressure on the nerve is released." (Xistris Dep., Ex. 16 to Pl.'s 56(a)1 Stmt., at 72:7–76:16.) Dr. Xistris explained the procedure to DiBari, telling him that it is a "simple" outpatient procedure with a normal recovery time of "four to six weeks," which, in 90 percent of cases, results in improved symptoms. (*Id.* at 75:22–76:23, 78:13–25.) Dr. Xistris agreed that DiBari did not have any contraindications to the surgery and that the

surgery would not be "medically inappropriate" for DiBari. (*Id.* at 94:6–21.) With respect to DiBari's thyroid condition, Xistris testified that diagnostic tests that he ordered showed "that there may be an element of hypothyroidism. . . . But overall, the functioning and need for thyroid hormone is normal." (*Id.* at 61:2–62:25.)

Dr. Xistris testified that based on his training and experience, he would typically recommend that patients who do not respond to conservative treatment undergo carpal tunnel release surgery. (Xistris Dep. at 32:15–34:2.) In DiBari's case, Dr. Xistris raised release surgery with DiBari because he believed "that conservative treatment, at this point in time, would not be beneficial," nor would "medical management . . . relieve his symptoms." (*Id.* at 81:14–82:12.)

Although Dr. Xistris discussed the surgery with DiBari, he does not perform the surgery itself, instead, Dr. Xistris informed DiBari that the procedure cane be performed by a neurosurgeon, an orthopedist, or a hand surgeon. Dr. Xistris' normal practice is to recommend three different surgeons to a patient so that the patient can choose the surgeon. (*Id.* at 73:11–13, 76:24–77:5.) Dr. Xistris did not address these risks in his conversations with DiBari because the surgeon performing the operation ordinarily discusses the risks that are typically associated with release surgery. (*Id.* at 77:15–22.) Dr. Xistris did not believe that he actually recommended any surgeons to DiBari because Dr. Xistris did not "think [DiBari] was very receptive to surgery." (*Id.* at 73:14–21.) In fact, after Xistris "offered surgery as another alternative" given DiBari's continuing disability, DiBari did not make a follow–up appointment with Dr. Xistris to discuss his decision regarding release surgery. (*Id.* at 74:10–75:7.)

Dr. Campo similarly recalled that DiBari decided independently to forego release surgery:

> Q: And you indicated that after consideration, Dr. DiBari, as your patient, was not comfortable with proceeding with carpal tunnel surgery? Right?
> A: Yes.
> Q: That was a decision he made?
> A: Yes.
> Q: And when he told you what his decision was, you supported that decision? Is that a fair statement?
> A: Yes.
> Q: But you did not make that decision for him?
> A: No, I did not.
> . . .
> Q: You did not make a medical judgment in which you informed him that he should not proceed with carpal tunnel syndrome [sic] ?
> . . .
> A: True.

(Campo Dep., Ex. 5 to Def.'s 56(a)1 Stmt., at 42:2–43:3.)  Dr. Campo did not believe that surgery was medically inappropriate for DiBari, however he agreed with DiBari's decision to forego the surgery "option."  (*Id.* at 207:21–208:7.)  According to Dr. Campo, DiBari did not have any contraindication to the surgery and "could withstand carpal tunnel surgery." (*Id.* at 207:21–208:23.)  Like Dr. Xistris, Dr. Campo pointed out that the final decision on surgery would have to be made by DiBari in consultation with a surgeon: "it's between the patient and the specialist."  (*Id.* at 151:4–152:5.)

Dr. Campo ultimately suggested to DiBari in March 2008 that he should stop practicing as a dentist because of his ongoing pain from carpal tunnel syndrome.  (*Id.* at 43:13–17, 145:23–153:6.)  His continuing course of treatment after that point included the previously prescribed conservative measures: "anti–inflammatories, possibly Tylenol, the ice packs, . . . rest, which would imply the wrist splints, as well as not . . . engaging in any

activities that would traumatize his hands more." (*Id.* at 165:4–13.) In Dr. Campo's view, these conservative treatments would not "reasonably improve [DiBari's] condition to the point where he could go back to being a dentist," and the only remaining avenues of treatment that could potentially restore some functionality to DiBari's hands were either release surgery or cortisone injections. (*Id.* at 166:4–167:14.) Dr. Campo has continued, as of March 2010, to visit monthly with DiBari, typically for fifteen minutes, during which Dr. Campo examines DiBari's hands and completes DiBari's disability status forms. (*Id.* at 93:12–24.)

Although Drs. Xistris and Campo both raised, as an alternative to surgical treatment, the possibility of cortisone injections into the median nerve, both were uncertain as to the efficacy and safety of such treatment. Dr. Xistris testified at his deposition that although "[s]ome physicians . . . would inject cortisone into the carpal tunnel . . . [m]ost of them will not do that" as a step preceding surgery. (Xistris Dep., Ex. 2 to Def.'s 56(a)1 Stmt., at 44:24–45:9.) Dr. Campo confirmed that, in his opinion, "there's disagreement in the medical profession about whether [injections are] a good thing or bad thing to do." (Campo Dep., Ex. 5 to Def.'s 56(a)1 Stmt., at 167:7–167:23.) Paul Revere's in–house medical consultant, Dr. John Groves, having reviewed Dr. DiBari's medical file, testified that "[t]he use of injections for Carpal Tunnel is somewhat controversial," adding that he did not like to use them because "[o]ne, . . . they last only temporarily, up to three to six months [a]nd secondly, there's a certain risk to giving injections, which is not so with surgical release," and confirming that Dr. Xistris did not recommend injections. (Groves Dep., Ex. 19 to Pl.'s 56(a)1 Stmt., at 98:19–99:5.)

Dr. Jerry Kaplan, who did not treat DiBari but serves as DiBari's expert neurologist, testified at his deposition that DiBari's hypothyroidism is a potential contraindication to the release surgery, explaining: "he has got the thyroid that's not working right. So any time it's not working right, I wouldn't, I wouldn't do it. It wouldn't be done." (Kaplan Dep., Ex. 9 to Def.'s 56(a)1 Stmt., at 204:15–205:6.) However, Kaplan later clarified that if after a period of time DiBari's thyroid condition improved, surgery "would be fine":

> Q: You said something about waiting a couple of months for Dr. DiBari's thyroid. Can you explain what you mean by that?
> A: I would repeat the studies in a couple—the question was specifically asked if Dr. DiBari wanted—it's a hypothetical. If Dr. DiBari wanted to have the surgery—
> Q: Right.
> A: —I would say that I would not let him, I would not let him go for the surgery until he was euthyroid for at least a few months. And then if he still remained symptomatic, which is quite likely, if he wanted to possibly get some symptomatic relief or—which might happen, or if he wanted to—well, if he wanted to get some symptomatic relief, I would think that that would be—and if the surgeon felt he could help him, I would say that would be fine.

(*Id.* at 213:12–214:4.) In his only reference to the functionality of DiBari's thyroid in his expert review of DiBari's medical records, Dr. Kaplan noted that "[b]lood tests revealed normal thyroid studies." (Kaplan Expert Review, Ex. 11 to Def.'s 56(a)1 Stmt., at Ex. B.) Kaplan also acknowledged that nowhere in the medical record did Dr. Campo conclude that release surgery would be an inappropriate form of treatment for DiBari's carpal tunnel syndrome and that under the prevailing medical standards, release surgery is an appropriate treatment for the condition. (*Id.* at 165:4–9, 169:23–170:20.) According to Dr. Kaplan, the release surgery "would probably relieve the pressure from the ligament." (*Id.* at 193:22–194:6.) Dr. Kaplan also agreed that DiBari "has refused the option of undergoing carpal tunnel release surgery." (*Id.* at 170:21–24.)

When asked to address the relationship between DiBari's decision to stop practicing as a dentist and the treatment of his symptoms, Dr. Kaplan did not characterize that decision as a step to alleviate symptoms as much as a necessary response to the limited functionality of DiBari's hands:

> Q: But you think it's appropriate for Dr. DiBari to decide to give up his practice as a dentist in order to address the symptoms he experienced of carpal tunnel syndrome; is that true?
> A: I think it's—well I don't think that's the reason for him to give up dentistry. For his symptoms. I never said that. It's his function. It's his patients at risk. It's the ability to do his job. It's his ability. It's his dexterity. It's his ability to actually suture.

(*Id.* at 151:1–11.)

E.    Paul Revere's Investigation and Medical Review

Paul Revere assigned Dr. Dibari's disability claim to lead disability benefits specialist Natale Algieri, who contacted DiBari by phone and letter and requested copies of his medical records from Drs. Campo and Xistris. (Algieri Dep., Ex. 13 to Pl.'s 56(a)1 Stmt., at 31:5–7; 5/27/08 Letter, Ex. 14 to Pl.'s 56(a)1 Stmt.) After Algieri spoke with DiBari and reviewed the information received from DiBari, Campo, and Xistris, on June 13, 2008 DiBari's file "was presented at TBA," a clinical consultation, at which a "full clinical file review was recommended." (Algieri Dep. at 91:3–92:24; Referral Notes, Ex. 20 to Pl.'s 56(a)1 Stmt.) The Referral Note, with respect to DiBari, notes that "the insured has not undergone surgery" and that "while surgery had been discussed with Dr. Xistris, as there was no guarantee of a positive outcome, it has not been pursued." (Referral Note.) After the clinical consultation, Nurse Linda Brown reviewed DiBari's file (Groves Dep., Ex. 19 to Pl.'s 56(a)1 Stmt., at 62:18–21), and concluded that "[h]e has failed conservative treatment but does not

wish to pursue additional treatment." (Brown Clinical Review, Ex. 21 to Pl.'s 56(a)1 Stmt.,

at 4.) Brown continued:

> There is no indication in the file that the insured was offered treatment other than the oral medications he has taken. He states that surgery was discussed, however since the outcome is not guaranteed, he did not wish to pursue this option. The insured medical history included hypothyroidism, hypertension, hyperlipidemia, and anxiety (related to his condition and the loss of earnings). These additional conditions do not appear to limit his functional ability.

(*Id.* at 5.) In response to a referral question asking Brown to "comment on if the medical

care the insured's [sic] has received from Dr. Xistris has been appropriate to date," Brown

noted:

> The insured has attempted conservative treatment with oral vitamins, without symptom improvement. It does not appear from the medical records that additional conservative treatment with wrist splinting, anti–inflammatories or steroid injection has been recommended or attempted. Additionally if conservative treatment fails, it would be reasonable to undergo a carpal tunnel release surgery which has a good success rate for improving function and decreasing pain.

(*Id.*)

Following Nurse Brown's review, DiBari's file was referred to Paul Revere's

"in–house medical consultant," Dr. John Groves. (Pl.'s Answer to Count Two of Def.'s

Countercl. [Doc. # 71] ¶ 19; Groves Clinical Review, Ex. 22 to Pl.'s 56(a)1 Stmt., at 2.) Dr.

Groves, without examining Dr. DiBari but after reviewing the medical file, noted that "[t]he

records do not report any treatment for carpal tunnel syndrome, in the form of splinting or

injections or referral for hand surgery consult," and after speaking with Dr. Xistris, Dr.

Groves additionally noted that "Dr. Xistris does not recommend injections due to the

potential of injury to the median nerve. Surgery has been suggested, but no hand surgery

referral has been made out specifically. The patient has not asked for hand surgery referral or any further specific treatment." (Groves Clinical Review at 3–4.) After speaking with Dr. Campo, Dr. Groves noted: "Referral to hand surgery has not been offered and no specific treatment has been offered for carpal tunnel syndrome except for Epsom salt soaks. . . . He has not requested a hand surgery consult or any further specific treatment. Surgery has not been suggested by Dr. Campo. There are no contraindications, on a medical basis, to surgery being performed for carpal tunnel syndrome." (*Id.* at 4.) Dr. Groves summarized his conversations with Xistris and Campos in letters sent to each of the Doctors on July 3, 2008. (7/3/08 Letter to Xistris, Ex. 23 to Pl.'s 56(a)1 Stmt.; 7/3/08 Letter to Campo, Ex. 24 to Pl.'s 56(a)1 Stmt.)

Dr. Campo responded to Groves' letter with a letter of his own, dated July 10, 2008, in which he explains:

> Surgery as a treatment option was brought up by Dr. Xistris. After consideration of the risks and benefits Dr. DiBari was not comfortable with this option. Indeed the surgery for carpal tunnel syndrome carries a significant risk of less than optimal outcome, as well as the possibility of no improvement or worsening over time. Even if successful, the gains may be short lived as he returns to the same work that originally caused the condition.
>
> In summary, it is my professional opinion that Dr. DiBari cannot perform the duties of his profession. He cannot hold and squeeze dental tools as required by his profession for several hours each day.
>
> After careful consideration, I believe that surgery is not justifiable at this time, as the symptomatology is extreme only when attempting to carry out the duties of his profession. Placing myself in his shoes, I certainly would not opt for surgery, considering the possible adverse outcomes mentioned earlier: therefore I agree with his decision. Dr. DiBari should have medical follow up every three months with me and the neurologist who can better monitor the carpal tunnel syndrome with the appropriate testing. Surgical

consultation and possible intervention will be necessary only if the nerve entrapment deteriorates.

(7/10/08 Letter to Groves, Ex. 25 to Pl.'s 56(a)1 Stmt.)[1] Dr. Groves submitted his "Medical Review" report on July 1, 2008, summarizing his review of DiBari's file and Groves' conversations with Drs. Campo and Xistris, and concluding: "The Insured appears to have moderately severe carpal tunnel syndrome in the left hand and less severe carpal tunnel syndrome in the right hand, for which he has had no specific treatment, apart from soaks with Epsom Salts, which is not a treatment used for CTS in this day and age." (Groves Medical Review, Ex. 31 to Pl.'s 56(a)1 Stmt., at 2.) Dr. Groves opined further:

> The restrictions and limitations, as given by Dr. Xistris and Dr. Campo in my opinion are probably supported on the basis of carpal tunnel syndrome bilaterally. The Insured does not appear to be pursuing appropriate care for his condition, which appears to be the prime cause of his having stopped work. Why the Insured is not receiving appropriate care is unclear, as there appears to be no medical contraindications to surgery or even injections. In addition, the Insured has not had conservative treatment in the form of splinting, which is the usual and customary treatment initially and if that fails, the injections or surgery are recommended and if injections fail, then surgery is the procedure usually recommended.
>
> In my opinion, the Insured does not appear to be pursuing appropriate care for his condition. The results with surgery are generally good for relief of symptoms and for a return to manual activities with the hands. The Insured appears to have no medical condition that would contraindicate surgery, as

---

[1] Paul Revere claims that DiBari attempted to actively influence Dr. Campo's response to Dr. Groves by faxing Dr. Campo a memo on July 10, 2008. (Pl.'s Mem. Supp. [Doc. # 80–1] at 11–12; Exs. 26–28 to Pl.'s 56(a)1 Stmt.) The documents that Paul Revere claims are faxes to Dr. Campo, however, do not include any time or date information, or any other information that would suggest that they were faxed by DiBari to Campo on July 10, or any other date, (*see* Exs. 26–28 to Pl.'s 56(a)1 Stmt.), nor does Paul Revere provide any additional factual information connecting these notes to a July 10, 2008 communication from DiBari to Campo.

related by his internist, Dr. Campo. Surgery for CTS is a very frequently performed procedure with minimal surgical risks. It would appear that CTS is the insured's prime cause of impairment, although stress and anxiety may be contributory.

Perhaps a paper IME [DMO] may be needed for appropriate care. The diagnosis seems clear and a hands–on IME does not seem needed.

(*Id.* at 2–3.)

By letter dated August 25, 2008, Paul Revere informed DiBari that it had completed its initial review of his file and explained with respect to DiBari's treatment:

According to our Board Certified Orthopedist's review, we understand that you have sought conservative treatment. We do question however whether it is appropriate for you not to pursue additional treatment options. These options may have allowed you to return to your occupation on a full time or partial/residual basis. We are continuing our review of your restrictions and limitations and whether your treatment is appropriate under the terms of the policies.

(8/25/08 Letter, Ex. 32 to Pl.'s 56(a)1 Stmt. at 4.) After DiBari updated Paul Revere as to his financial situation by informing Paul Revere that he had sold his dental practice, Paul Revere sent DiBari a follow–up letter on September 22, 2008 confirming the sale and again expressing doubt "as to whether it was appropriate for you not to pursue additional treatment options for your carpal tunnel condition." (9/22/08 Letter, Ex. 33 to Pl.'s 56(a)1 Stmt., at 1–2.) Subject to a full reservation of rights during its ongoing evaluation, Paul Revere paid disability benefits to DiBari during this process. (8/25/08 Letter; 9/22/08 Letter.)

Paul Revere subsequently arranged for an "external peer review" of DiBari's file through MLS Peer Review Services, and MLS directed DiBari's records to Dr. Daniel Olsen, a board–certified hand surgeon, for review. (Young Aff., Ex. 38 to Pl.'s 56(a)1 Stmt.) After reviewing the file from Paul Revere, Dr. Olsen concluded: "Conservative treatment has not

14

been completed in this case to include correct ergonomics, bracing, injections, possible therapy, etc. Surgery is appropriate for any positive nerve study carpal tunnel syndrome or one refractory to conservative modalities." (Olsen Report, Ex. 35 to Pl.'s 56(a)1 Stmt., at 4.) Olsen continued with respect to release surgery and other potential treatments:

> It is the number one hand surgery done with relief of symptoms and good recovery allowing most patients to return to normal activities and pursuits. There is a very low complication rate and a low percentage of recurrence. As a dedicated hand surgeon for many years, I can say from the "paper IME" review, that it seems there should be more conservative treatment done with steroid injections and bracing and correct ergonomics teaching. Endoscopic carpal tunnel release which I favor as the most minimally invasive style and most comfortable recovery would be a good idea for a hand intensive professional, such as a dentist. While there is no "guarantee", in this carpal tunnel release surgery or in the claimant's dental work, it is likely to have a good outcome with relief and be uneventful as it is statistically the case in the majority. It is common knowledge to be [a] relieving and rewarding procedure. It should be considered in this case to preserve the training and livelihood of this dentist. From this record review, there is no apparent contraindication to proceeding with this surgery. There is no apparent foundation for total disability noted in this record review. Further treatment is recommended as above.

(*Id.*) Dr. Groves then submitted a Supplemental Medical Review, agreeing with Dr. Olsen's conclusions. (Olsen Supplemental Medical Review, Ex. 36 to Pl.'s 56(a)1 Stmt.)

By letter dated November 25, 2008, Paul Revere summarized the findings of Dr. Olsen and Dr. Groves, along with the colloquy with Dr. Xistris and Dr. Campo, and informed DiBari that he was no longer eligible for benefits under the Disability Income or BOE Policies:

> Based upon the reports of your neurologist, our in–house board–certified orthopedic surgeon (fellowship trained in hand surgery), and that of the independent hand surgeon, Dr. Olsen, it is our conclusion that you have not received nor have pursued the appropriate care under the prevailing medical

standards for your condition.  It is our understanding that with the appropriate care, the evidence suggests you would be able to return to your regular occupation.

We believe that Dr. Xistris and Dr. Olsen have provided specific recommendations for care which are appropriate for your condition and which would allow you to return to your former occupation as a general Dentist.  Our in–house consulting board–certified orthopedic surgeon has concurred with the appropriateness of this treatment plan.  Dr. Campo has not disputed the appropriateness or reasonableness of this treatment plan. Rather he has not implemented an appropriate treatment plan since you do not wish to return to your former occupation. Indeed, Dr. Campo has simply advised you to abandon your occupation.  You waited until just shortly before the sale of your practice before notifying the company of your claim for benefits.  It is your right to choose not to pursue the care that would return you to your occupation.  However, in order to continue to receive benefits, it is your obligation under the terms of your policy to obtain curative treatment that is available and which is reasonably expected to allow you to return to work.  Therefore, because you have failed to do so, it is our conclusion that you are no longer eligible for benefits under the terms of your policies.

(11/25/08 Letter, Ex. 34 to Pl.'s 56(a)1 Stmt., at 8.)  The letter informed DiBari that Paul Revere had filed its declaratory action in this Court in order "to seek the assistance of the court in fairly resolving our differences and disputes" and further advised DiBari that "[r]ather than terminate your benefits, while the lawsuit is pending, we will continue to waive the required premiums and to pay you benefits under your Individual Policy, policy #01–02471374, under a reservation of all rights and defenses until further order or decision by the court."  (*Id.*)

II.     Discussion[2]

        A.      "Physician's Care"

Paul Revere moves for summary judgment on its Complaint for declaratory relief on the ground that DiBari cannot collect disability benefits under either the Disability Income or BOE Policy because he is not "receiving regular and personal Physician's Care which is appropriate, under prevailing medical standards, for the condition causing his disability." (Pl.'s Mem. Supp. at 19.) Paul Revere argues that appropriate care includes surgical care and that because "[i]t is undisputed that carpal tunnel release surgery is a form of appropriate medical care for carpal tunnel syndrome, with a high likelihood of success and low risk of recurrence" and "[i]t is further undisputed that DiBari has no medical contraindications that prevent him from having carpal tunnel release surgery," as a matter of law, by refusing release surgery, DiBari is not receiving appropriate care and is accordingly ineligible for disability benefits. (*Id.* at 19–20.)

DiBari, in also moving for summary judgment, argues that he is receiving "appropriate" care for his condition, and because that is the sole ground on which Paul Revere seeks to avoid paying DiBari benefits, he is entitled to judgment in his favor on Paul Revere's Complaint and is accordingly entitled to collect disability benefits under the

---

[2] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). *See also infra* pp. 26–27.

Policies. (Def.'s Mem. Supp. at 20.) DiBari contends that under both Policies, he need only receive "regular and personal care" that is appropriate and that "regular care" does not, as a matter of law, include surgery.[3] (*Id.* at 26–28.)

1.    "Regular Care" vs. "Appropriate Care"

As a preliminary dispute of heightened importance, the parties disagree over the appropriate reading of the phrase "the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability." Paul Revere reads this amendment to impose on DiBari "an express and unambiguous obligation . . . to obtain care that is appropriate for his bilateral carpal tunnel syndrome, judged objectively by reference to prevailing medical standards of accepted treatment for that condition." (Pl.'s Mem. Supp. at 21.) DiBari disagrees, arguing instead that this amendment only obligates DiBari to receive "regular and personal care"; only if the care received is somehow inappropriate can Paul Revere deny benefits. (Def.'s Opp'n at 22; Def.'s Reply at 8.)

Resolution of this dispute significantly impacts the ultimate issue of what care DiBari is required to pursue. If DiBari's only responsibility is to receive "regular care," the question

---

[3] DiBari also argues in moving for summary judgment that he is receiving "regular and personal care" that is appropriate due to his exhaustion of viable conservative treatment options. (*See* Def.'s Mem. Supp. at 22–26.) Paul Revere does not argue in its Motion for Summary Judgment that DiBari has failed to adequately pursue conservative treatment, and rests its argument with respect to appropriate care under the Policies solely on DiBari failure to sufficiently explore release surgery. In its Opposition to DiBari's Motion for Summary Judgment, Paul Revere in effect concedes that Dr. DiBari exhausted all conservative treatment options in order to emphasize its argument that where the other options have failed, "[t]he only remaining viable treatment is surgery." (Pl.'s Opp'n [Doc. # 85] at 6.) Accordingly, the only relevant dispute with respect to DiBari's care is whether his alleged failure to adequately pursue release surgery is a dereliction of his duties under the Policies.

becomes whether surgery is included within the purview of regular care, a question that the Seventh Circuit has answered in the negative. *See Heller v. Equitable Life Assurance Soc'y*, 833 F.2d 1253, 1257 (7th Cir. 1987); (Def.'s Mem. Supp. at 26–27.) If DiBari is obligated to receive care that is appropriate for his condition, the question becomes whether surgery is included within the purview of "appropriate care" to treat carpal tunnel syndrome, a question that other courts have answered in the affirmative. *See, e.g., Provident Life & Accident Ins. Co. v. Henry*, 106 F. Supp. 2d 1002, 1003–05 (C.D. Cal. 2000); *Reznick v. Provident Life & Accident Ins. Co.*, 364 F. Supp. 2d 635, 638 (E.D. Mich. 2005); (Pl.'s Opp'n at 12.)

DiBari relies in large part on *Heller* in arguing both that his only responsibility under the Policies is to receive "regular care" and that regular care does not include surgical procedures. (*See* Def.'s Mem. Supp at 27–29.) The policy clause at issue in *Heller*, however, made no mention that the care received must be appropriate; the policy only provided that "total disability will not be considered to exist for any period during which the Insured is not under *the regular care and attendance of a physician*." 833 F.3d at 1255 (emphasis added). In response to the insurer's argument that Dr. Heller was not "totally disabled" because he "refused to submit to surgery to relieve the debilitating and limiting effects of his carpal tunnel syndrome condition," the Seventh Circuit held that "the language in the policy stating that the claimant must be 'under the regular care and attendance of a physician' clearly does not include surgical procedures." *Id.* at 1256–57.

Paul Revere relies, in turn, on cases interpreting the language "receiv[e] care by a Physician which is appropriate for the condition causing the disability" to "impose[] a duty on the insured to seek and accept appropriate care for his disabling condition." *Henry*, 106

F. Supp. 2d at 1003–05 (finding that, subject to this duty to "seek and accept appropriate care" a genuine issue of material fact remained for trial as to "whether, under the circumstances of this insured's disability, carpal tunnel syndrome release surgery is appropriate care"); *see also Reznick*, 364 F. Supp. 2d at 638 ("The Court interprets the condition of 'receiving care by a Physician which is appropriate' as imposing on the insured a duty to seek and accept appropriate care.") (citing *Henry*).

Notably, both DiBari and Paul Revere cite to *Buck v. Unum Life Ins. Co.*, No. C-08-5166 MMC, 2010 WL 887379 (N.D. Cal. March 11, 2010), in which the Northern District of California considered an insured's duty to undergo carpal tunnel release surgery under two separate disability insurance policies, one of which provided for benefits while the insured is "under the care of a physician," and the other provided for benefits where the insured "is receiving medical care from someone other than himself which is appropriate for the injury or sickness." *Id.* at *3, *5. With respect to the former policy, the court relied on *Heller* in holding that the policy only obligated the insured "to periodically consult and be examined by his or her treating physician" and did not "condition eligibility for benefits on the insured's submitting to surgery to treat the disability." *Id.* at *3–4. With respect to the latter policy, the court held that "the term 'receiving medical care from someone other than himself which is appropriate for the injury or sickness' is unambiguous, and requires the claimant to receive appropriate care for the injury or sickness upon which his claim is based." *Id.* at *7.

The language in the Paul Revere Policies, "the regular personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability" is not significantly different that the language in the policies found in *Henry* and

*Buck* to obligate the insured to "seek and accept appropriate care." *Henry*, 106 F. Supp. 2d at 1005. Informed by this reasoning, the Court concludes that this language unambiguously obligates Dr. DiBari to do more than merely receive "regular care"; it imposes on Dr. DiBari the duty to seek and accept appropriate medical care for his carpal tunnel syndrome.

###### 2. Surgery as Appropriate Care

The question remains whether DiBari, by refusing carpal tunnel release surgery, has failed to fulfill this duty to seek and accept appropriate care for his disabling condition. The courts in *Henry*, 106 F. Supp. 2d at 1005, and *Buck*, 2010 WL 887379 at *7, declined to decide on summary judgment whether refusal of carpal tunnel release surgery constituted failure to receive appropriate care, holding that the appropriateness of the release surgery for the patients in those cases was a determination to be made at trial in light of the record of competing evidence. The court in *Buck* found that insurer Unum "failed to show it [was] entitled to summary judgment" on its claim that Dr. Buck, who suffered from carpal tunnel syndrome and refused release surgery, was not entitled to disability benefits under a policy that required him to receive appropriate care because the conflicting opinions of Buck's treating physician and Unum's consulting physician required credibility determinations. 2010 WL 887379 at *7. Dr. Belaga, Dr. Buck's treating physician, in the course of his treatment advised both Dr. Buck and Unum that Dr. Buck "was not a suitable candidate for surgery," however Unum's consultants, on whom Unum relied in denying benefits, disagreed. *Id.* at *7 & n.8. Similarly, in *Henry*, the court recognized that "[t]he parties present[ed] evidence on both sides" of whether release surgery was appropriate care for Henry's carpal tunnel syndrome.

There is no comparable conflict in the summary judgment record here: the undisputed facts demonstrate that conservative treatment failed to resolve Dr. DiBari's symptoms, and although both his regular physician and neurologist believed that release surgery was neither contraindicated nor medically inappropriate and had a high rate of success, DiBari declined release surgery and sought no surgical consulation. Dr. Campo, DiBari's regular physician, and Dr. Xistris, DiBari's neurologist, agreed that conservative carpal tunnel syndrome treatment methods have failed to resolve DiBari's symptoms. (Claim Form, Ex. 11 to Pl.'s 56(a)1 Stmt., at 1–3; Xistris Dep. at 81:14–82:12; DiBari Dep. at 41:10–12.) Where conservative treatment methods fail, the remaining treatment options consist of carpal tunnel release surgery, (Xistris Dep. at 32:15–34:2) and cortisone injections, which DiBari's doctors and Paul Revere's consultant agree are disfavored as compared to release surgery (*id.* at 44:24–45:9; Campo Dep. at 167:7–167:23; Groves Dep. at 98:19–99:5). Dr. DiBari's physicians did not believe that release surgery was contraindicated or medically inappropriate. (Xistris Dep. at 94:6–21; Campo Dep. at 207:21–208:23.)

Nonetheless, unsupported by any medical advice or evidence that release surgery was not an appropriate option for his condition, Dr. DiBari elected not to have the surgery. (Xistris Dep. at 73:14–75:7; Campo Dep. at 42:2–43:3, 151:4–152:5.) Dr. Campo thereafter recommended to Dr. DiBari that he stop practicing as a dentist; however Campo did not characterize this lifestyle change as a form of treatment, nor did he believe that it would help alleviate DiBari's symptoms to the point where he might be able to go back to work. (Campo Dep. at 145:23–153:6, 166:25–167:6.) Rather, as indicated in his July 10, 2008 letter to Dr. Groves, Dr. Campo believed that Dr. DiBari had to retire because he "cannot perform the duties of his profession." (7/10/08 Letter to Groves.) Dr. DiBari, having not pursued release

surgery, did not stop work in order to treat his carpal tunnel syndrome, but because his untreated condition served as an obstacle to his work. (*Id.*; Kaplan Dep. at 151:1–11.)

These undisputed facts demonstrate that by forgoing release surgery despite the failure and impracticality of other treatment options and where his doctors did not believe that there was any reason that this surgery would pose a risk to Dr. DiBari or be otherwise unsuccessful, Dr. DiBari failed to seek and accept appropriate care. Dr. DiBari has presented no evidence that release surgery was not the appropriate course of treatment at this point in the progression of his chronic condition. *See Henry*, 106 F. Supp. 2d at 1005. Unlike in *Buck*, 2010 WL 887379 at *7, there is no contradictory testimony from any physician regarding whether DiBari could receive the surgery. Dr. Kaplan's testimony that he would not have recommended release surgery due to DiBari's thyroid condition (Kaplan Dep. at 204:15–205:6), was based on records of Dr. Campo's prescription of thyroid medication, not on any record of medical testing (*id.* at 186:9–188:2), and Dr. Kaplan acknowledged that in the event that DiBari's thyroid condition improved, surgery would not be a concern. (*Id.* at 213:12–214:4.) Since Dr. Xistris, DiBari's neurologist, testified that medical testing indicated that DiBari's thyroid functioned at a normal level (Xistris Dep. at 62:9–25) and neither Xistris nor Dr. Campo believed that there was any contraindication to the surgery, Dr. Kaplan's testimony that DiBari is hypothyroid, does not contradict or undermine Dr. DiBari's treating neurologist's testimony that his thyroid functioning was within normal limits and surgery was not contraindicated, and it is insufficient to overcome Paul Revere's *prima facie* showing that release surgery is the appropriate medical treatment for Dr. DiBari's condition at this point.

Although Dr. Campo agreed with Dr. DiBari's decision to stop practicing as a dentist rather than pursue surgery, he based that decision not on a belief that surgery was inappropriate for DiBari, but on the fact that the easier option for DiBari was just to retire. (7/10/08 Letter to Groves.) This is not comparable to Dr. Belaga's opinion in *Buck*, 2010 WL 887379 at *7, that Dr. Buck was not a suitable candidate for surgery. Rather, Dr. Campo merely supported Dr. DiBari's decision to retire rather than pursue surgical release.

Dr. DiBari's right to choose his own course of treatment (or non–treatment) is not impinged by the Court's decision. *See Henry*, 106 F. Supp. 2d at 1005. However, his choice carries with it the consequence that under the terms of the Paul Revere Policies, he no longer qualifies for disability benefits because he has failed to seek and accept care that is appropriate to treat his bilateral carpal tunnel syndrome. Where a generally successful and medically appropriate treatment undisputedly exists for DiBari's condition in the form of release surgery, and after all recommended non–surgical treatments have failed, Dr. DiBari's decision to decline release surgery that could reduce or eliminate his disability demonstrates a failure to comply with the policy requirement that he receive appropriate care for his condition. Accordingly, Paul Revere is entitled to summary judgment on its Complaint for declaratory relief.

B.      Dr. DiBari's Duty to Mitigate

Paul Revere also moves for summary judgment on its Complaint on the ground that DiBari was obligated to have surgery under his "independent duty of good faith and fair dealing to cooperate and to mitigate disability through treatment which is not inherently dangerous and which medical opinion indicates is designed to relieve the disability." (Pl.'s Mem. Supp. at 25.) As implied by its Memorandum, and as clarified by counsel at oral

argument, Paul Revere's argument with respect to DiBari's duty to mitigate seeks to impose on DiBari the same duty to seek and accept appropriate care as discussed above. Because the Court has determined that Paul Revere is entitled to declaratory relief on the basis of Dr. DiBari's failure to seek and accept appropriate care for his carpal tunnel syndrome under the contractual provisions of the Policies, the Court need not address Paul Revere's alternate duty–to–mitigate theory regarding Dr. DiBari's duty to receive appropriate care.

### C.     Dr. DiBari's Counterclaim

Paul Revere also moves for summary judgment on DiBari's remaining counterclaim that Paul Revere breached the implied covenant of good faith and fair dealing by taking action without performing "some meaningfully 'reasonable and adequate investigation,' including either a medical examination or the opinion of an independent expert."  (Pl.'s Mem. Supp. at 30–31 (citing 3/11/10 Order [Doc. # 67] at 9–10).)  The Court, in ruling on Paul Revere's Motion to Dismiss [Doc. # 25] Dibari's counterclaims, previously dismissed all of DiBari's counterclaims except for the claim that Paul Revere's investigation "was unreasonable and not based upon all available information" due to Paul Revere's failure to perform a medical examination or consult an independent medical expert.  *See Paul Revere Life Ins. v. DiBari*, 3:08cv1795(JBA), 2010 WL 918084, at *5 (D. Conn. March 11, 2010).  Paul Revere now points to the medical review "by independent, board–certified physicians specializing in hand surgery" and argues that it is accordingly entitled to summary judgment on DiBari's claim of procedural bad faith.  (Pl.'s Mem. Supp. at 31.)  DiBari argues in opposition that neither Dr. Groves nor Dr. Olsen were "independent experts" sufficient to avoid a claim of bad–faith investigation and, in any event, his bad faith claim is not confined to Paul Revere's failure to consult an independent expert, but is also evidenced in Paul

Revere's taking a position that it knew was inaccurate, holding DiBari to a standard it knew was unsupported by the terms of the Policies, discounting the concerns of Drs. Campo and Xistris, and seeking repayment of benefits under a reservation of rights. (Def.'s Opp'n at 35–40.)

As an initial matter, despite DiBari's argument to the contrary, the Court's March 11, 2010 Order on Paul Revere's Motion to Dismiss expressly dismissed all claims of bad faith by DiBari except the allegations of failure to adequately investigate based on Paul Revere's failure to either examine DiBari or consult an independent expert. *DiBari*, 2010 WL 918084 at *5. Accordingly, the only question remaining on summary judgment concerns whether Paul Revere fulfilled its investigatory obligation to either conduct a medical examination or obtain the opinion of an independent expert. It is undisputed that Paul Revere conducted no medical examination of Dr. DiBari. However, Paul Revere argues that the medical opinion submitted by Dr. Olsen suffices as the opinion of an independent expert. Paul Revere submitted DiBari's file to MLS Peer Review Services, which is "neither owned by nor controlled by Unum Group or Paul Revere," in order to obtain "an external peer review." (Young Aff.) MLS then arranged for Dr. Olsen to independently review the file. (*Id.*)

Where a party moving for summary judgment has carried its burden and "has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts . . . or on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)).  The nonmoving party must be able to cite to "particular parts of materials in the record" in order to support a claim that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c); *see Aslandis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) ("Once this burden is met, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists.").  Such a claim must rely on "more than a 'scintilla of evidence,'" *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), and bald assertions or conclusory allegations do not create a genuine issue of material fact  *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Del. & Hudson*, 902 F.2d at 178.  If the nonmoving party cannot come forward with sufficient evidence to demonstrate a genuine issue of material fact and "the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (citations and internal quotation marks omitted).

In demonstrating the independence of Dr. Olsen's review, Paul Revere "has established a *prima facie* case demonstrating the absence of a genuine issue of material fact" with regard to DiBari's counterclaim.  *Bryant*, 923 F.2d at 982.  In response, DiBari argues:

> Even if Dr. Olsen worked for a company "independent" of Paul Revere, that would not mean he is unbiased.  Such companies tend to perform work for insurance companies and so–called "independence" does not equate with a lack of bias.  Indeed, it appears that Dr. Olsen's report was, in fact, biased as his review included Paul Revere's "Activity Notes" and Dr. Groves' slanted an inaccurate representations regarding Dr. DiBari's treatment.  See Pl's Ex. 35 (Olsen "Independent Peer Review") at 3.  Moreover, given the inaccurate statements in Dr. Olsen's report, Paul Revere either failed to provide Dr. Olsen with documents it should have, such as Dr. Campo's APS forms, or it did provide them to him and Paul Revere failed to note the inaccuracies in Dr. Olsen's report, choosing instead to rely on what it knew was inaccurate and incomplete information.

(Def.'s Opp'n at 36 n.12.)  This argument fails altogether to cite to particular parts of the record that affirmatively demonstrate that Dr. Olsen's review was not "independent."  *See Aslandis*, 7 F.2d at 1072.  DiBari offers nothing but surmise, conjecture, and conclusory allegations to suggest that Dr. Olsen was not an independent expert, relying on claimed inaccuracies in Olsen's report and on what DiBari claims is practice among reviewing companies, without offering any factual support.  These bald assertions are not enough to create a genuine issue of fact with respect to DiBari's counterclaim.  *See Carey*, 923 F.2d at 21; *Del. & Hudson*, 902 F.2d at 178.  Paul Revere is accordingly entitled to summary judgment on Dr. DiBari's remaining counterclaim.

III.     Conclusion

For the reasons stated above, Paul Revere's Motion for Summary Judgment [Doc. # 80] is GRANTED and DiBari's Motion for Summary Judgment [Doc. # 77] is DENIED.  The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 19th day of November, 2010.